J-A09015-20

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| IN RE: ADOPTION OF N.M.T. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: M.G. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1353 WDA 2019 |

Appeal from the Order Entered August 5, 2019
In the Court of Common Pleas of Fayette County Orphans' Court at
No(s):  46 Adopt 2017

BEFORE:   SHOGAN, J., MURRAY, J., and STRASSBURGER, J.[*]

MEMORANDUM BY SHOGAN, J.:                    FILED JULY 07, 2020

M.G. ("Mother") appeals from the August 5, 2019 order denying her petition for the involuntary termination of the parental rights of M.T. ("Father") with respect to their seven-year-old son, N.M.T. ("Child"), born in April of 2012, pursuant to the Adoption Act, 23 Pa.C.S. § 2511(a)(1), (2), and (b).  Upon careful review, we affirm.

Since 2017, the Honorable Steve P. Leskinen has presided over two parallel actions involving Child: a child custody matter filed by Father on May 23, 2017, and the subject involuntary termination matter filed by Mother on June 22, 2017.  The orphans' court initially denied Mother's petition by order dated December 29, 2017 ("prior order"), which Mother timely appealed.  This

_____

[*] Retired Senior Judge assigned to the Superior Court.

Court vacated the prior order due to the orphans' court's legal error in failing to appoint counsel to represent Child's legal interests during the termination proceeding that occurred on October 23, 2017 ("prior proceeding").[1] See In re Adoption of N.M.T., 200 A.3d 585, 157 WDA 2018 (Pa. Super. filed October 18, 2018) (unpublished memorandum). We remanded the case for the court to appoint counsel to represent Child's legal and best interests. Further, we directed newly appointed counsel to review the prior termination proceedings and notify the orphans' court whether new proceedings were required. See id.

On remand, the orphans' court appointed counsel to represent Child's legal interests and a guardian ad litem ("GAL") to represent his best interests. A new termination hearing occurred on May 20, 2019 ("new proceeding"). Child's counsel advocated for the termination of Father's parental rights. In its statement in lieu of an opinion, the orphans' court stated that the GAL "did not recommend a finding that termination was in [C]hild's 'best interests.'"[2] Statement, 11/5/19, at 4.

_____

[1] Pursuant to 23 Pa.C.S. § 2313(a), a child who is the subject of a contested involuntary termination proceeding has a statutory right to counsel who discerns and advocates for the child's legal interests, defined by our Supreme Court as a child's preferred outcome. In re T.S., 192 A.3d 1080, 1082 (Pa. 2018) (citing In re Adoption of L.B.M., 161 A.3d 172 (Pa. 2017)).

[2] Neither Child's counsel nor the GAL filed a brief in this appeal. Rather, they filed separate letters stating that they "rely on and defer to" the opinion of the orphans' court.

In the August 5, 2019 order, the orphans' court denied Mother's petition because it found "no real evidence that the termination of parental rights would be in the 'best interests'" of Child. Order, 8/5/19. In addition, the orphans' court found, "Mother has continuously engaged in a suggestive and vindictive effort to alienate [C]hild from his Father, and that such bad behavior should not be, and will not be, rewarded." Id. The orphans' court then stated, "In all other respects, the [c]ourt's earlier findings remain unchanged." Id.

The orphans' court set forth the following findings from the prior proceeding as follows:[3]

> 2. Father has had no contact with [C]hild since August of 2012, but Mother deliberately excluded Father from contact with [C]hild, and Father was unable to secure legal counsel that he could afford.
>
> 3. Father should have done more than he did to maintain contact before formally filing for custody in May of 2017, but a combination of ignorance and poverty prevented him from pursuing a role in [C]hild's life for the entire four and one-half year period where no contact took place.
>
> 4. In a direct response to Father filing for custody in May of 2017, Mother filed the within termination petition in June of 2017. . . .
>
> 5. At the time of filing, Mother was neither engaged to, nor married to[,] the proposed adoptive father. Instead, the engagement and marriage were directly triggered by the [c]ourt's remarks that it could not be in [C]hild's best interests to terminate parental rights where there was no legally qualified adoptive father currently seeking to adopt.

_____

[3] The following witnesses testified during the prior proceeding: Mother; J.T., Mother's husband; Father; and Tony Schrim, the court-appointed reunification counselor from the custody matter.

6. The proposed adoptive father, [J.T.], married Mother on September 21, 2017. . . . [They] got engaged during the pendency of these proceedings sometime in July of 2017. Mother is currently pregnant with his biological child.

7. [J.T.] is qualified to serve as a father figure, and is a perfectly nice gentleman, but he simply has not been in the position as stepfather long enough to bond with [C]hild to the point it is necessary to exclude the biological father.

8. The [c]ourt finds as a fact, however, that [C]hild has not accepted [J.T.] as his father, and hasn't had enough time to generate a permanent bond with him. In so finding, the [c]ourt accepts the testimony of Tony Schrim, wherein [C]hild asserted only that his maternal grandfather has been "I guess" my father. In counseling sessions, [Child] expressed a desire to meet his biological father. Schrim further opined that [Child] is more reserved than a typical child his age, but that is not a negative for reuniting with Father. He also suggested that [Child] will be "quick to attach" to one or both, but it will depend on how he is treated by and interacts with both. Schrim specifically noted that [Child] did enjoy activities with [J.T.], but did not refer to him as "Dad."

9. The [c]ourt concludes that there have been periods of time exceeding six months preceding the filing of the custody case and the within termination proceeding where [Father] has failed to perform parental duties, or that he evidenced a settled purpose of relinquishing parental claim. Father's inaction, or delayed action, in this regard could qualify as grounds for termination under § 2511(a)(1), but only if such termination was in the best interests of [C]hild.

10. The [c]ourt finds that the grounds set forth in § 2511(a)(2) have not been established. . . . Father appears to be perfectly capable of remedying his past failures to directly provide care for [C]hild.

11. [C]hild is not firmly bonded with Father or with the proposed adoptive father. Neither man has been an integral part of [C]hild's life for long enough to create a permanent bond. Going forward, both men appear capable of making direct contributions to the well-being of [C]hild.

12. [C]hild has the potential to have a permanently bonded parental relationship with both Father and the proposed adoptive father, but it hasn't occurred yet. At this point, the statute does not empower this [c]ourt to terminate Father's parental rights because [C]hild's relationship with the proposed adoptive father could possibly or even or even could probably become a solid parental bond.

Orphans' Court Opinion, 12/29/17, at ¶¶ 2-12. Therefore, the orphans' court found that terminating Father's parental rights was not in the best interests of Child pursuant to 23 Pa.C.S. § 2511(b). See id. at ¶ 13.

By way of further background, on June 22, 2017, the same date that Mother filed the termination petition, the orphans' court issued an order in the custody matter appointing Tony Schrim, program director at Counseling Connections, to provide reunification counseling for Father and Child ("reunification order"). N.T., 10/23/17, at 69. At the time of the prior proceeding, Mr. Schrim had conducted twelve sessions with Father, six sessions with Mother, and an unspecified number of sessions with Child, but Father and Child had not yet met. Id. at 70-72. Mr. Schrim testified that Child "has some socialization issues and separation anxiety." Id. at 71. Despite that, he testified that Child "readily engaged in conversation" with him during private sessions. Id. at 72. Mr. Schrim testified that Child told him, "I don't have a dad. I guess my grandfather is my dad." Id. at 73. Mr. Schrim testified that at the end of Child's last session three weeks before the prior proceeding, Child was ready to be introduced to Father. Id. at 75. Finally, Mr. Schrim testified that Mother had been generally cooperative

with the reunification counseling at the time of the prior proceeding, but her "primary objection seemed to be meeting with [Father] or having [Child] meet [Father]. And whenever these topics have been brought up, there is usually some kind of disagreement or disconnect between [Mother and me]." Id. at 76.

While Mother's appeal was pending from the prior order, she filed in the orphans' court a motion to stay the reunification order. An evidentiary hearing occurred on April 6, 2018, when Child was nearly six years old and in kindergarten, during which Mother presented the testimony of Scott Tracy, Ph.D., whom she retained in the custody matter to perform a biopsychosocial evaluation of Child. Mr. Shrim also testified at the April hearing. Following the evidentiary hearing, the orphans' court denied Mother's motion to stay the reunification order.

By the time of the May 20, 2019 hearing, six visits had occurred between Father and Child, who was then seven years old. The visits were supervised by Phyllis Jin, Esquire, who was court-appointed in the custody case. The visits occurred on April 3, 2019, May 1, 2019, May 4, 2019, May 8, 2019, May 15, 2019, and May 18, 2019. All of the visits lasted for two hours except for the sixth visit, which lasted for four hours. Ms. Jin provided written reports from each visit, wherein she quoted Child's statements to Father as well as described Child's behavior. We set forth her testimony most relevant to the six visits, as follows.

The first supervised visit occurred at an arcade game facility. Ms. Jin testified that Father asked Child if he wanted something to eat, but Child refused to look at Father, did not want Father to talk to him, did not want Father to watch him play video games, and actively avoided Father by moving to another area if Father approached him. N.T., 5/20/19, at 99-100. Ms. Jin testified as follows with respect to the second or third air hockey game she played with Child, at his request, after she won the first game against him.

> And we were playing back and forth and he was killing me by the second and third game. He was really playing hard into the game. And he, at one point, he said, he was at the table facing [Father], my back was toward [Father]. [Child] asked me . . . how he was doing, and I said you are doing great, you are killing me here. You know thinking he is referring to the game. . . . And [Child] came around the table and he slammed down the little handle that you push the puck with, and he said am I doing good? I said you are doing great. You are killing me. He said I don't want to do great. And I said do you want me to win? I will be happy to win this. He said I don't mean air hockey. I said what are you talking about? Are you talking about this visit? And he said yes, am I doing great? And I said well it is not going as good as this game, so why don't you just scoot around the table and we will finish the game. . . .

Id. at 101-102.

Ms. Jin testified that the second visit occurred at her office because Child had fractured his right femur since the first visit, and he needed to use a wheelchair during his recovery. N.T., 5/20/19, at 104. She testified that although Father tried to engage Child in conversations about his leg, baseball, or if he used crutches, Child did not want to speak with Father. Moreover, Child repeatedly stated that Father is not his dad, that he did not like Father,

that he did not want to talk to Father, and that he did not like Father because Father left him when he was a baby. Child also remarked several times that no one told him what to say. Id. at 104-105.

Ms. Jin testified that the third visit occurred in Mother's home because Ms. Jin was concerned about transporting Child due to his broken leg. Ms. Jin testified that Mother and J.T. had agreed not to be present on the premises during the visit, but they, in fact, remained on the property during the entire visit. N.T., 5/20/19, at 107-109. Ms. Jin testified that Mother told Child, "I am not going anywhere. If you need me, I will be here." Id. at 108. Ms. Jin described the visit as follows.

> Q. Now, during this visit, did [Child] make any statements similar to what he said in the past about [Father] or the visit?
>
> A. Well initially he was upset when he saw [Father] come through the door. [Father] said hello to [Mother] and he said hi to [Child]. And [Child] was holding onto [Mother's] hand. He was laying on, still on the couch, and he said [, W]hat are you doing in my house. This is not your house. And [Mother] said if you need anything, just call and I will come in and so then she left. But it was the same thing that had occurred in the prior visits. You know, he would not talk to him. He laid on the couch and he had either his arm over his eyes [--] [Father] was sitting to his right [--] or [Child] took the pillow and he tried to cover himself up.
>
> Q. And again when [Father] asked him why he didn't like him, what was [Child]'s response?
>
> A. He said, . . . I don't like [Father]. [Father] asked him why. He said, [B]ecause you left me when I was a baby. And [Father] again said, I am here now and I'm trying to see you. And [Child] said you are wasting my time."

Id. at 109-110.

The fourth visit occurred in Father's home, and Ms. Jin testified "actually it was probably the best visit as far as atmosphere goes. It is a fun place. There is a little boy there who is six years old. There [are] a lot of toys. . . ."[4] N.T., 5/20/19, at 114. Ms. Jin testified that Child frequently repeated the same phrases as in the prior visits. Id. at 112. Further, Ms. Jin testified that although Father pointed out that Child's picture was on the wall of his home, Child called Father a liar and refused to look at the pictures. When Father told Child he loved him, Child responded that Father does not love him, that Father is a liar, and that Father had his chance to be Child's dad, but did not want to be his dad. Id. at 112-113 (emphasis added).

Ms. Jin testified that Father picked Child up for the fifth visit, which again occurred at Father's home. N.T., 5/20/19, at 114. She testified that the visit was similar to all of the others. Ms. Jin explained that Child made a new remark to Father, as follows:

_____

[4] Father testified in the prior proceeding that he resided with his fiancée, J.B., and her then nearly five-year-old biological son, whom he legally adopted after the natural father voluntarily relinquished his parental rights. N.T., 10/23/17, at 43. As best we can discern, Father adopted him sometime between 2015, and the time he filed the custody complaint in May of 2017. Father explained that, in 2015, he retained the law firm representing him in the termination and custody matters, and he began making payments to the firm at that time in an effort to file the custody action concerning Child. Id. at 54-55. In addition, Father testified that the same firm represented him in the adoption proceeding. On cross-examination, Father testified that he adopted J.B.'s son before initiating Child's custody action because the natural father of the little boy "was signing over his rights and I had to be there. So financially . . . we had to make a hard decision on which one came first, unfortunately." Id. at 55.

Well, on every visit, he says I don't want to be here. I hate my dad. You are not my dad. I hate you. Those kind of statements are made numerous times throughout the entire visit. . . . And as [Father] continued to try and speak with [Child], [Child] said I hate you and then [Father] asked him, you know, what would you like to do? What can I do? He always asks him that. What can I do to make this better? And [Child] yelled[, Y]ou're not my dad. Why are you causing trouble, making my mom bring me here with a broken leg. If I break my leg again, my mom will go to jail. You left me when I was a baby. I don't have a stepdad. I mean this is how he says things. I mean [Child] doesn't say them in complete sentences or . . . he just blurts out little phrases. [Father] repeatedly said to him, I love you . . . I have tried for the last two to three years to see you. I am not trying to hurt you or anyone. [Child] said, [I]t has been more than three years. You left me when I was a baby. You are just causing trouble.

Id. at 116-117 (emphasis added).

The sixth visit also occurred at Father's house. Ms. Jin testified that the custody exchange with Mother, the maternal grandmother, Father, and J.B. occurred at a gas station. During that custody exchange, when Mother and maternal grandmother were getting Child out of the car, Child was saying, "I don't want to go. I don't want to get out." N.T. 5/20/19, at 118. Ms. Jin testified that the maternal grandmother "was behind [Child], trying to help him across the seat, and she said to him, I know you don't want to go, [Child], but nobody cares about you." Id. at 119. In addition, Ms. Jin responded on direct examination, in part:

> Q. Incidentally, at these exchanges, what is [Mother's] behavior like at the exchanges?
>
> * * *

A. She is not happy to be there. And she expresses that quite frequently. This is ridiculous. She has to get the wheelchair out and put together and she [is] upset that she is there. … You know she is upset. [S]he is not happy to be there.

Q. Does she . . . make these comments in front of [Child]?

A. Sometimes. Not all the time, but sometimes, yes.

Id. at 119.

Lastly, Ms. Jin testified that, during the sixth visit, Child stated to Father, "I hate you. Why do I have to come here on a Saturday? You are wasting my day off." N.T. 5/20/19, at 122. She continued, "I thought that was kind of an odd remark so I kinda joked with [Child,] and I said are you employed that this is your off day. But he didn't respond to that." Id. Ms. Jin testified as follows regarding Father's response to Child:

> [Father] replied I want to see you and visit with you. [Child] said, you don't care about me. You only care about the other boy. You weren't there for my birthday or Christmas and then he yelled, you weren't there. [Father] said, [Child], I did try for so long. I know it is hard for you to understand. [Child] yelled, I don't want to be here. No matter how many times you make me come here, I won't love you. [Father] replied, I love you, [Child]. [Child] interrupted and yelled, stop lying. You are lying. And then [Father] said I do love you.

Id.

In addition, Mother presented the testimony of Child's maternal uncle, Child's maternal grandmother, and Child's maternal grandfather. Father presented the testimony of J.B., his fiancée, and Ms. Jin. Mother called Dr. Scott Tracy, a psychiatrist hired by Mother to evaluate and counsel Child, on

rebuttal from Ms. Jin's testimony. Finally, the orphans' court incorporated all of the testimony from the prior proceeding.[5]

Following the May hearing, by order dated and docketed August 5, 2019, the orphans' court denied Mother's involuntary termination petition pursuant to 23 Pa.C.S. § 2511(b). Order, 8/5/19. On September 4, 2019, Mother timely filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The orphans' court filed a statement in lieu of a Rule 1925(a) opinion on November 5, 2019. Statement, 11/5/19, at 4.

On appeal, Mother presents the following issues for our review, which we have re-ordered for ease of disposition:

I. Whether the [orphans'] [c]ourt erred and abused its discretion in failing to conclude that [Mother] met her burden of proof in establishing grounds for termination of [Father's] parental rights pursuant to 23 Pa.C.S.A. [§] 2511(a)(1) and/or 23 Pa.C.S.A. [§] 2511(a)(2)?

II. Whether the [orphans'] [c]ourt erred and abused its discretion in concluding that a combination of [F]ather's ignorance and poverty prevented him in pursuing a role in [Child's] life for the four and a half year period where no contact took place?

_____

[5] Dr. Tracy testified during the May proceeding and Child's counsel also presented his testimony from the April 6, 2018 custody hearing. Although the testimony from the custody hearing was incorporated by the orphans' court and is partially contained in the reproduced record, Mother failed to include a copy of the same in the certified record; thus, we are unable to review it. We note that it is Mother's responsibility to ensure that the certified record contains all items necessary to review her claims. Commonwealth v. Tucker, 143 A.3d 955, 963 (Pa. Super. 2016).

III.     Whether the [orphans'] [c]ourt erred in qualifying Tony Schrim, an unlicensed therapist, as an expert witness, and failing to disregard any testimony proffered by him?

IV.     Whether the [orphans'] [c]ourt erred and abused its discretion in failing to adopt the expert testimony of Dr. Scott Tracy?

V.     Whether the [orphans'] [c]ourt erred and abused its discretion in failing to conclude that the developmental, physical and emotional needs and welfare of [Child] warrant a termination of [Father's] parental rights pursuant to 23 Pa.C.S.A. [§] 2511(b)?

VI.     Whether the [orphans'] [c]ourt erred and abused its discretion in finding that there is no real evidence that the termination of parental rights would be in the best interests of [C]hild?

VII.     Whether the [orphans'] [c]ourt erred and abused its discretion in concluding there was no legally qualified adoptive father currently seeking to adopt [Child] in the within matter?[6]

VIII.     Whether the [orphans'] [c]ourt erred and abused its discretion in concluding that [Child] has not accepted the proposed adoptive father as his father and that he was not bonded with the proposed adoptive father to the point necessary to exclude the biological father?[7]

_____

[6] This issue relates to the orphans' court's finding in the prior order that Mother's engagement and marriage to J.T. was "directly triggered by the [c]ourt's remarks that it could not be in [C]hild's best interest to terminate parental rights where there was no legally qualified adoptive father currently seeking to adopt." Orphans' Court Opinion, 12/29/17, at ¶ 5; see also 23 Pa.C.S. §§ 2901, 2902, 2711. Because there is no dispute in this appeal that J.T., as Child's legal stepfather, is qualified to adopt Child if Father's parental rights were terminated, we need not review this issue.

[7] Likewise, this issue relates to the orphans' court's finding in the prior order that a bond did not then exist between Child and JT. Mr. Schrim's testimony, set forth above, supports the orphans' court's finding in that regard. However, by the time of the new proceeding, there was no dispute that a bond had developed between Child and J.T.

IX. Whether the [orphans'] [c]ourt erred and abused its discretion in failing to consider and/or adopt the testimony of [Mother] and the proposed adoptive father in regards to the best interest and welfare of [Child], in regard to the bond that [Child] shared with the proposed adoptive father for over a year and in that [Child] considers and calls the proposed adoptive father dad?

X. Whether the [orphans'] [c]ourt erred and abused its discretion in concluding that [Mother] has continuously engaged in a suggestive and vindictive effort to alienate [Child] from [Father]?

Mother's Brief at 4-6.

We apply the following standard of review:

[A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. In re R.J.T., 608 Pa. 9, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. Id.; R.I.S., 36 A.3d [567, 572 (Pa. 2011) (plurality opinion)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Id.; see also Samuel Bassett v. Kia Motors America, Inc., [613] Pa. [371], 34 A.3d 1, 51 (Pa. 2011); Christianson v. Ely, 575 Pa. 647, 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. Id.

As we discussed in R.J.T., there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. R.J.T., 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases,

- 14 -

an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. In re Adoption of Atencio, 650 A.2d 1064, 1066 (Pa. 1994).

In re Adoption of S.P., 47 A.3d 817, 826-827 (Pa. 2012).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

In re L.M., 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the following provisions are relevant:

(a) General Rule.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary

for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\*\*\*

(b) Other considerations. The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (2), (b).

Mother's first and second issues on appeal asserts that the orphans' court abused its discretion in determining that she did not satisfy her burden of proof under Section 2511(a)(1) and/or (2). Mother's Brief at 24. With respect to Section 2511(a)(1), "the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties." In re Z.S.W., 946 A.2d 726, 730 (Pa. Super. 2008) (citation omitted). We have explained,

[T]he trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the

> evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

In re B., N.M., 856 A.2d 847, 855 (Pa. Super. 2004) (citations omitted). The court must then consider "the parent's explanation for his or her conduct" and "the post-abandonment contact between parent and child" before moving on to analyze Section 2511(b). In re M.X.G., 933 A.2d 647 (Pa. 2007)(per curiam) (quoting In re Adoption of Charles E.D.M., 708 A.2d 88, 92 (Pa. 1998)).

Our Supreme Court has explained that parental duty "is best understood in relation to the needs of a child." In re Burns, 379 A.2d 535, 540 (Pa. 1977).

> A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this Court has held that the parental obligation is a positive duty which requires affirmative performance. This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child. Because a child needs more than a benefactor, parental duty requires that a parent 'exert himself to take and maintain a place of importance in the child's life.'

Id. (citations omitted).

This Court has explained that a parent does not perform his or her parental duties by displaying a "merely passive interest in the development of the child." In re B., N.M., 856 A.2d at 855 (quoting In re C.M.S., 832 A.2d 457, 462 (Pa. Super. 2003)). Rather, "Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every

problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances." Id. (citation omitted).

Contrary to Mother's assertion, we conclude that the orphans' court indeed determined that Mother met her burden under Section 2511(a)(1). As the orphans' court stated in its opinion,

> The court concludes that there have been periods of time exceeding six months preceding the filing of the custody case and the within termination proceeding where [Father] has failed to perform parental duties, or that he evidenced a settled purpose of relinquishing parental claim. Father's inaction, or delayed action, in this regard could qualify as grounds for termination under § 2511(a)(1)… .

Orphans' Court Opinion, 12/19/17, at ¶9.

There is no dispute that prior to the supervised visits that began in April of 2019, Father last saw Child in the fall of 2012. N.T., 10/23/17, at 46-50. Father testified on direct examination that he resided with Mother in the home of Child's maternal grandparents until Child was three or four months old. Id. at 46. He testified that he chose to move out because he was "just totally made a fool of in that house [by Mother and the maternal grandmother]. And I had nothing to do other than get out, delete myself from that situation." Id. at 47.

Thereafter, Father met with Child and Mother outside of the home approximately three times, and then "it started to fade out with the visitation." N.T., 10/12/17, at 48. Father explained, "After I moved out, nothing was asked of me. I was trying to get visitation, something settled outside of the

- 18 -

[c]ourts and nothing of the sort was happening until Christmas time. When Christmas [of 2012] rolled around[,] I did have a lot of Christmas presents for him[,] and I was unable to see him." Id. at 50. Father continued to respond:

Q. Did you ask to see him?

A. Yes, I did.

Q. And who did you ask?

A. I asked [Mother].

Q. And what was the response you got?

A. Something about her being sick, not being able to make it. I could not come see him. And I asked if she could at least come to my parents' house so I could give him the gifts that she could take to him. And that was out of the question. And then nothing.

Id. Father testified with respect to why he waited so long to file a custody complaint, as follows.

Q. Can you tell us why you haven't done anything up until May 23rd of [2017], as far as enforcing your right to see [Child]?

A. At that time, I was struggling. And I regret this to the day I die. I have a lot of time to make up with him. But at that time, financially I knew I was going to have to go through this type of situation, to where there was no way that I could have an attorney and all that, have Child Support on me. And I wanted to work, I worked my way up the ladder. I went into . . . as nothing[,] and I am an Assistant Manager now making good money. My motivation was [Child] the whole time.

Id. at 51.

We discern no abuse of discretion by the orphans' court in concluding that Father's failure to maintain any association with Child for four and one-half years prior to filing the custody action warrants the termination of his

parental rights pursuant to Section 2511(a)(1). See In re B., N.M., 856 A.2d at 855 ("[T]he trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. . . . Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances.") (citations omitted).[8] Although statutory factors of (a)(1) were met, the orphans' court concluded that termination of Father's parental rights would not be in the best interests of Child, as require by 23 Pa.C.S. § 2511(b).

Regarding Section 2511(a)(2), this Court has explained that the moving party must produce clear and convincing evidence of the following elements to terminate parental rights:

> (1) repeated and continued incapacity, abuse, neglect or refusal;
> (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

_____

[8] Because we conclude that Father's parental inaction for four and one-half years supports the orphans' court's finding regarding Section 2511(a)(1), we need not consider Mother's second issue, wherein she asserts that the orphans' court abused its discretion in finding that Father's "ignorance and poverty prevented him from pursuing a role in [C]hild's life for the entire four and one-half year period where no contact took place." Mother's Brief at 4. This finding is not relevant in light of the orphans' court's ultimate determination. See id. at ¶ 9.

See In re Adoption of M.E.P., 825 A.2d 1266, 1272 (Pa. Super. 2003).

In the instant case, the record supports the orphans' court's conclusion that Mother did not meet her evidentiary burden under Section 2511(a)(2) because "Father appears to be perfectly capable of remedying his past failures to directly provide care for [C]hild." Orphans' Court Opinion, 12/29/17, at ¶ 10. Indeed, Father initiated a custody action on May 23, 2017. Likewise, during the prior proceeding, he testified:

> Q. Are you able to provide for [Child] now?
>
> A. Absolutely, yes.
>
> Q. [W]e have stipulated that there is a child support issue pending.
>
> A. Yes.
>
> Q. And you are ready, willing and able to support [Child]?
>
> A. 100%.

N.T., 10/23/17, at 51. As such, Mother did not prove that Father had not remedied the conditions that led Child to be without Father's parental care. Mother's first issue fails.

Mother's remaining issues challenge the orphans' court's conclusion that Mother did not meet her burden of proof with respect to Section 2511(b). Mother's Brief at 4-6. That section provides:

> (b) Other considerations.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings,

- 21 -

income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(b).

This Court has stated:

The focus in terminating parental rights under section 2511(a) is on the parent, but the focus turns to the children under section 2511(b). In re Adoption of C.L.G., 956 A.2d 999, 1008 (Pa. Super. 2008) (en banc). Under section 2511(b), we examine whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In re C.M.S., 884 A.2d 1284, 1286-1287 (Pa. Super. 2005). "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." Id. at 1287 (citation omitted).

In the Interest of M.T., 101 A.3d 1163, 1181 (Pa. Super. 2014) (en banc). As part of the needs-and-welfare analysis, the orphans' court "must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." In re C.M.S., 884 A.2d at 1287 (citation omitted). However, "[i]n cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." In re K.Z.S., 946 A.2d 753, 762-763 (Pa. Super. 2008) (citation omitted).

Here, there is no dispute that a bond does not exist between Father and Child. However, the orphans' court determined that Mother has alienated

Child from Father since the prior proceedings, which had prevented any bonding. The orphans' court found, "Mother's cold and arrogant behavior is psychological child abuse. Any time that [C]hild can spend in a more relaxed and kind environment, such as that available at Father's home, would be beneficial to [C]hild." Statement, 11/5/19, at 4. As such, the orphans' court concluded that terminating Father's parental rights was not in Child's best interest.

The orphans' court's conclusion is based on credibility findings in favor of Father and against Mother. In addition, the orphans' court made credibility findings in favor of Mr. Schrim and against Dr. Tracy. The orphans' court stated, in part:

> Mother is completely biased and self-serving, and she deviated from the truth whenever she thought it might aid her. . . . Father has demonstrated nothing short of complete sincerity and unbelievable patience throughout these difficult and prolonged proceedings.
>
> With respect to the two witnesses qualified as experts, this [c]ourt did find the testimony of Tony Schrim to be more credible and persuasive than the testimony of Dr. Scott Tracy, despite the latter's superior curriculum vitae and other professional qualifications. In that regard, Dr. Tracy was financially rewarded by Mother, and it was clear that she expected value for her money. . . . On the other hand, Mr. Schrim received a relatively modest payment for his services, and the court was impressed with his sincerity and the common-sense logic of his opinions. In that regard, the evidence is clear that [Child] did not begin calling the proposed adoptive father "dad" until <u>after</u> Schrim testified that [Child] considered his grandfather to be his "father," at which point Mother clearly demanded compliance from [Child] to support the narrative she wanted the [c]ourt to believe.

Statement, 11/5/19, at 2-3 (emphasis in original). Given the above testimony and evidence, the orphans' court did not abuse its discretion in concluding that termination of Father's parental rights was not in Child's best interest.

Turning to Mother's next issue on appeal, she contends that the orphans' court erred in qualifying Mr. Schrim in the prior proceeding as an expert in the field of family counseling, bonding, and reunification. Mother's Brief at 42. Mother argues that the orphans' court erred because (1) Mr. Schrim was precluded from testifying to conduct of Father that occurred prior to the filing of the involuntary termination petition and (2) Mr. Schrim was not licensed in Pennsylvania. We review this issue for an abuse of discretion. See In re C.M.T., 861 A.2d 348, 355 (Pa. Super. 2004) (internal quotations and citations omitted) (stating, "The decision to admit or to exclude evidence, including expert testimony, lies within the sound discretion of the trial court. Generally, we review a trial court's evidentiary rulings for abuse of discretion[.]").

Pennsylvania Rule of Evidence 702 governs the admissibility of expert testimony. The rule provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson;

> (b) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; and
>
> (c) the expert's methodology is generally accepted in the relevant field.

Pa.R.E. 702. Our Supreme Court has made clear, "[T]he standard for qualification of an expert witness is a liberal one. The test to be applied when qualifying an expert witness is whether the witness has any reasonable pretension to specialized knowledge on the subject under investigation." Miller v. Brass Rail Tavern, 664 A.2d 525, 528 (Pa. 1995) (emphasis in original).

During the prior proceeding, Mother's counsel objected to the orphans' court permitting the testimony of Mr. Schrim, stating, "I don't believe that he can produce any testimony whatsoever with respect to [Father's] conduct prior to the filing of this Petition that would lead to grounds for termination."[9] N.T., 10/23/17, at 65. The orphans' court denied Mother's objection because Mr. Schrim was appointed as a reunification counselor in the custody case, which Father initiated before Mother filed the involuntary

---

[9] The orphans' court inferred that Mother was relying on Section 2511(b), which provides, in part, "With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition." 23 Pa.C.S. § 2511(b).

termination petition. See N.T., 10/23/17, at 65. We discern no abuse of discretion.

Mother's claim that the orphans' court abused its discretion in permitting the testimony of Mr. Schrim because he was not licensed in Pennsylvania is waived due to her failure to lodge an objection in this regard during the prior proceeding. Thompson v. Thompson, 963 A.2d 474, 475-476 (Pa. Super. 2008) ("In order to preserve an issue for appellate review, a party must make a timely and specific objection at the appropriate stage of the proceedings before the trial court. Failure to timely object to a basic and fundamental error will result in waiver of that issue.") (citation omitted).

Even if not waived, we would conclude that Mother's claim is without merit, based on Mr. Schrim's testimony during voir dire by Mother's counsel, as follows:

Q. Mr. Schrim, are you licensed as a counselor in Pennsylvania?

A. No.

Q. Have you ever been licensed as a counselor in Pennsylvania?

A. No.

Q. And with respect to licensing, is it a requirement of the Commonwealth of Pennsylvania in order for someone to be licensed in order to provide family counseling?

A. No.

Q. What are the state requirements?

A. There are no real state requirements. The requirements that exist are primarily those identified by insurance companies for the purposes of billing.

N.T., 10/23/17, at 68.[10] As such, even if not waived, Mother's claim would fail for being disingenuous.

In her next issue, Mother argues that the orphans' court abused its discretion in failing to "adopt the testimony" of Dr. Tracy "due to the substantial amount of evidence which supports Dr. Tracy's conclusions." Mother's Brief at 47. In reviewing this issue, we are mindful that the orphans' court was required to give Dr. Tracy's testimony "due consideration," but it "was not obligated to delegate its decision-making responsibility" to Dr. Tracy. K.W.B. v. E.A.B., 698 A.2d 609, 613 (Pa. Super. 1997) (citing Rinehimer v. Rinehimer, 485 A.2d 1166, 1169 (1984) ("While it need not accept their conclusions, 'the lower court was obligated to consider the testimony of the two experts[.]'")).

Upon thorough review, we deem Dr. Tracy's conclusions equivocal with respect to Section 2511(b), discussed infra. To the extent that Dr. Tracy's conclusions supported terminating Father's parental rights, the orphans' court considered his testimony along with all of the evidence in this case. We

_____

[10] During the May proceeding, Dr. Tracy confirmed that in Pennsylvania "there is no law that prevents people from participating in the practice of counseling or psychotherapy" without a license. N.T., 5/20/19, at 81-82. Dr. Tracy testified that a license is required "to give a Behavioral Health Diagnosis." Id. at 82.

discern no abuse of discretion by the orphans' court in refusing to adopt Dr. Tracy's conclusions, in light of the totality of the evidence.

Mother's remaining issues are all related, thus we review them together. In short, Mother argues that Child "is an extremely shy child, [and] has attachment issues and separation anxiety. To now disrupt [Child]'s life[,] in light of his personality and in light of the love and stability that he receives in his bonded relationship with [J.T.] . . . [,] is certainly contrary to [C]hild's best interest." Mother's Brief at 36. The record does not support Mother's argument.

In the May proceeding, Dr. Tracy testified on direct examination by Child's counsel that following the April 6, 2018 custody hearing, he conducted weekly psychotherapy sessions for Child discussed above. He testified that he treated Child for the following conditions:

> Number one was separation anxiety[,] which was his initial diagnosis. The second was impulsivity. [Child] is an active little boy. And the third thing that we were looking at was the possibility of a developmental delay[,] so what that essentially means is that there were parts of [Child] that were somewhat behind or somewhat immature for what you would expect to see [in] a child [of his age].

N.T., 5/20/19, at 73. Dr. Tracy acknowledged that there has been "some improvement over the course of the past year with regard to" Child's separation anxiety. Id. at 74. For instance, Dr. Tracy testified Child "seemed to be doing well in school. He has had some success with athletic activities within [his] peer group." Id. Significantly, Dr. Tracy opined that the cause

of Child's separation anxiety "clearly was a result of the ongoing litigation between [Mother] and [Father]." Id. at 75. Likewise, Dr. Tracy testified that with respect to a possible developmental delay, there has been "[n]o regression. Maybe some slight improvement and that is something, you know[,] that what I would recommend is that we continue to monitor as the child progresses from first into second grade." Id. at 75.

On cross-examination by Mother's counsel, Dr. Tracy testified:

Q. [H]ave you observed [Child's] reunification with [Father] having any negative impact on [C]hild?

A. Well[,] so I think the negative impact, if I am answering your question, is just the angst that he has and the resistance that he has for the meetings. I mean he is functioning in school. You know, he is successful on an athletic team. So I don't think that it is like causing a secondary depression or, we don't see any evidence of post-traumatic stress. . . .

Id. at 92-93. Further, because of improvement in Child's separation anxiety, Dr. Tracy testified that he decreased the frequency of Child's sessions during the last year from weekly, to biweekly, to monthly. Id. at 72, 89-90.

With respect to the effect on Child of terminating Father's parental rights, Dr. Tracy testified on direct examination, as follows.

Q. Can you offer an opinion as to the effect a proposed termination of [Father]'s parental rights would have on [Child]?

A. So[,] I don't think that [Child] would have any deleterious effects which means I don't know that he would suffer any psychological consequences. . . . In my interactions with [Child] in the year, I don't know that he processes [Father] as being a significant figure in his life. I do think with the reunification counseling though that [Child] now clearly understands that

[Father] is his biological father. I don't know that he has much meaning in that.

. . .

Q. If the parental rights of [Father] were not terminated, if the request was denied, could that result in positive influence in [Child]'s life?

A. So I will give you an answer that I usually tell clients. Today, my crystal ball has broke [sic]. And so it is very difficult to predict, you know, what's going to happen in the future. I think it could be positive, you know. And I mentioned, . . . the timing of all this is the most difficult. And so what [Child] is entering now [is] the stage of concrete operations. And that's where the world for him is very rigid. . . . And so this was a twist for him that he wasn't prepared for. I think that's worsened because I do believe we are dealing with a child that has a slight developmental delay, and so if this . . . event would have occurred when [Child] was a little older, I don't think he would have the amount of conflict and turmoil. If it would have happened younger, before concrete operations, I don't think he would have it. But you are at a formidable stage right now where the child is resisting this reunification.

. . .

Q. And is that out of the ordinary given his developmental delays, his separation anxiety, his impulsivity?

A. No, with all of the things, that's not out of the ordinary. Now, at the age of 12 or 13, he may want to seek his father, right. And so again][,] that's where my crystal ball, if it would work, that would be typically, what you would see is the child then enters formal operations, which is right at the onset of adolescence, and all that changes and he may have a desire to see his biological father. Most kids [d]o.

N.T., 5/20/19, at 76-78. Based on this equivocal testimony, we discern no abuse of discretion by the orphans' court in concluding that terminating Father's parental rights was contrary to Child's best interests.

Moreover, Dr. Tracy's testimony ultimately supported the orphans' court's conclusion that Mother has alienated Child from Father since the prior proceeding. On cross-examination by Father's counsel, Dr. Tracy acknowledged that, in August of 2018, which was approximately four months after the orphans' court denied Mother's request to stay the reunification order, he recommended that reunification counseling be transferred from Mr. Schrim to Kate Vozar. N.T., 5/20/19, at 85-86. He explained that he "frequently [makes referrals] to her." Id. at 86. Dr. Tracy stated that Child's reunification counseling was transferred to Ms. Vozar, and that he received a "verbal report" from her. Id. He testified:

> Q. Do you know that Kate Vozar discharged them from reunification counseling?
>
> A. So[,] what I remember from the verbal report was, I didn't know discharge, but that she, I guess she had found evidence of parental alienation, so that's the context that I remember.
>
> Q. So you were informed that she suspected parental alienation?
>
> A. Yes.

Id. at 86. Dr. Tracy did not opine whether parental alienation existed in this case. However, on cross-examination by Father's counsel, he testified:

> Q. You will agree with me that if parental alienation is happening, that can affect the anxiety of the child. Correct?
>
> A. Yes.
>
> Q. When it comes to reunification.
>
> A. Yes.

- 31 -

Q. And[,] in fact[,] it is a huge factor with regard to anxiety with a child attempting to reunify with another parent?

A. Right. And so that's what fuels, if you remember me talking about adverse childhood experiences, so it is that parental alienation where one parent is talking about another, arguing about another in front of the child, that is at the root of the adverse childhood experience.

Q. [I]f I can give you a hypothetical, if a child is being exchanged for a visit with the parent he is being reunified with, and during that exchange, the child says I don't want to go. He is not my dad. And the mom says to the child, I know you don't want to go. These people don't care. Is that something that could affect him?

A. Yes.

Id. at 90-91.

During the new proceeding, Dr. Tracy testified on rebuttal to Ms. Jin's testimony. On rebuttal, Dr. Tracy testified that he reviewed Ms. Jin's reports and opined that they revealed "resistance behaviors" by Child and separation anxiety, "especially in that first visit or two when he repeatedly wanted to call [Mother]." N.T., 5/20/19, at 131. Dr. Tracy continued on inquiry by Mother's counsel:

Q. And with respect to the statements of [Child] that are contained in the report, do you have any concerns after viewing those reports containing the statements that there is alienation going on?

A. So as it was described and as I read it in there, I didn't see overt signs of alienation. And so you know what that means is I didn't observe it myself. . . . And so . . . there was one sentence in there that seemed unusual for a child that age to say, but other than that, it doesn't mean that he didn't say that, and it was only one time. So alienation, parental alienation is not a one-time event. It is a process. And so you would have to see those kinds

- 32 -

of statements time and time again, serially, with multiple observations, and so with the three that I saw there I don't appreciate parental alienation from what I saw. . . .

Id. at 131-132. Similarly, on cross-examination by Father's counsel, Dr. Tracy confirmed his opinion that there would have to be a continued pattern of behavior, more than just one observation, for parental alienation to exist. Id. at 135.

On cross-examination by Father's counsel, Dr. Tracy was presented with the February 28, 2019 report of Kate Vozar, the former reunification counselor, and asked to acknowledge its parallel or similarity to Ms. Jin's report from the first supervised visit. Dr. Tracy acknowledged that both reports indicated that Child did not want to "do great" in his visit with Father. See N.T., 5/20/19, at 133-135. Thereafter, on inquiry by the orphans' court with respect to Ms. Jin's reports, Dr. Tracy testified:

> Q. When a child is seven years old and they come up with a statement like I don't like you because you left me while I was a baby. How would he know that someone left while he was a baby?
>
> A. That's one of the statements that was somewhat puzzling because at that developmental level, it would be unlikely that a child would say that particular statement if he hadn't heard it... .
>
> Q. And assuming he wasn't asked specifically, you know, who told you to say that, isn't it odd that he would say nobody told me what to say?
>
> A. That is an odd response for that age, yes.
>
> Q. And again the following week, you left me when I was a baby, you are wasting my time. I mean wasting my time seems like an odd concept to me for a seven year old.

A. Correct.  At this developmental level, yes.

Q. On the visit on the 8th, as it is documented, everything you say is a lie.  You had your chance to be my dad.  That's not him talking, is it?

A. The lie part might be.  The second clause in that doesn't….

Q. He heard somebody say that?

A. Correct, yea.  That's what I think.

Q. And then on the 15th, why would you make my mother bring me here with a broken leg.  If I break it again, my mom will go to jail.  He didn't think of that himself, did he?

A. No, I am not sure what would prompt him to say that my mother would go to jail.  I am sure he probably heard family members talking about hey this is terrible you have got to go with a broken leg.  The second part, again the second part of that clause is difficult for me to comment on.

Q. Now on May 18th, Ms. Jin documented that mom said in his hearing at the custody exchange I know you don't want to go [Child], but nobody cares about you and this is ridiculous.[11]  In his hearing.  Is that not something that would be an alienating comment designed to sabotage the visit?

A. If it was said directly to the child, yes.

Q. Well if it was said when he can hear it.  I mean in his hearing, does it make a difference if it is addressed to him or if he just hears it?

A. No, I think in, a lot of times children hear things from other rooms, and so I have no way to answer the context of that.  But that would be something that he would have heard from adults whether it was directed to him or whether it was secondary or indirect, yes.  That's an adult[-]oriented comment.

_____

[11]  Ms. Jin's testimony was that the maternal grandmother, not Mother, remarked to Child during a custody exchange when she "was behind [Child], trying to help him across the seat, and she said to him, I know you don't want to go, [Child], but nobody cares about you."  N.T., 5/20/19, at 119.

Q. And on that visit, which was May 18th, [Mother] says as quoted by Ms. Jin, but nobody cares about you. And later on in the visit, child says to Father, you don't care about me. That's exactly what his mom said so I mean he didn't think of that himself, he had help.

A. Correct, right, whether i[t] was direct or indirect.

Q. I mean young children resist things that they think that they can be successful at resisting[,] and[,] to the extent that he continues to resist, it is because he believes he will be met with success if he continues to resist. He feels persistence will be rewarded.

A. Correct. In behaviorism, we call that secondary gain.

Id. at 136-139.

Based on the testimony of Dr. Tracy and Ms. Jin, we discern no abuse of discretion by the orphans' court in determining that Mother alienated Child from Father. Further, there is no evidence that Child's visits with Father have increased his separation anxiety. Mr. Schrim's testimony supports the orphans' court's finding that "[Child] is more reserved than a typical child his age, but that is not a negative for reuniting with Father." Orphans' Court Opinion, 12/29/17, at ¶ 8; see also N.T., 10/23/17, at 77, 80. In addition, the record supports the orphans' court's credibility determinations in favor of Mr. Schrim and against Mother with respect to whether Child was calling J.T. "dad" at the time of the prior proceeding, when J.T. was his legal stepfather for one month. See Orphans' Court Opinion, 12/29/17, at ¶ 8; see also N.T., 10/23/17, at 73-75, 86.

In sum, the record supports the finding of the orphans' court that Child had been ready to reunify with Father at Mr. Schrim's last session with Child three weeks before the prior proceeding, and that Mother subsequently alienated Child from Father during the pendency of this matter. We discern no abuse of discretion by the orphans' court in concluding that terminating Father's parental rights under the totality of the circumstances in this protracted case does not serve Child's developmental, physical, and emotional well-being under Section 2511(b).[12] Accordingly, we affirm the order denying Mother's petition for the involuntary termination of Father's parental rights.

Order affirmed.

_____

[12]   [A]ppellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

Adoption of S.P., 47 A.3d at 826-827.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>7/07/2020</u>